**MUAGUTUTI'A F. TUIA, Petitioner**

**v.**

**L. A. YANDALL, Chairman, Election Board, HIGH CHIEF FAII-VAE, H. T. C. MASANIAI, Members of the Board; and HIGH CHIEF FOFO SUNIA, Election Commissioner, Respondents**

No. 256-1964

High Court of American Samoa

Civil Jurisdiction, Trial Division

December 18, 1964

Petitioner *pro se*.
Respondents by Donald Tindal, Acting Attorney General.

OPINION OF THE COURT

ROEL, *Associate Justice.*

Petitioner, Tuia, filed his original Petition on December 2, 1964, against the members of the Election Board. Subsequently, with leave of Court on December 8, 1964, Tuia filed an amended complaint in which he included Fofo Sunia, Election Commissioner, as Respondent, together with the three members of the Election Board. Petitioner sought to enjoin the Election Board and the Election Commissioner from holding a new election for the House of Representatives from Tualauta County.

In his complaint Petitioner sets out that Petitioner on the 13th day of October 1964 filed with the office of the Election Commissioner an application to become a candidate for the House of Representatives for Tualauta County, for the Ninth Session of the Legislature of American Samoa; that there were two other candidates besides the Petitioner for the same seat, namely Fonati Aufata and Otto Haleck; that an election for said House seat was held on the 3rd day of November 1964, under the supervision of the Election Commissioner and his staff; that the election was legally held in an orderly manner under the supervision of the

561

Election Commissioner in accordance with Chapter 2.05, Code of American Samoa; that after the closing of the polls, the ballot boxes were taken to a central designated place for counting; that all three candidates for the House seat were present at the time of the counting of the ballots for Tualauta County; that after the counting of the ballots was completed, the result of the tabulation showed Fonati Aufata with 19 votes, Otto Haleck with 204 votes and Tuia, Petitioner, with 287 votes. That following the counting of the votes, an announcement was made by a representative of the Election Commissioner declaring Petitioner the winner of the election by a majority of all the votes in Tualauta County; that Respondents be enjoined from calling another election for the House of Representatives seat in Tualauta County for the following reasons: That an election was legally held in an orderly manner; that the witnesses called before the Election Board did not testify under oath, notwithstanding the fact that Petitioner requested that witnesses be required to testify under oath; that the decision of the Election Board regarding Otto Haleck's complaint was based on unsworn testimony; that the Election Board has no authority under Section 2.0504 of the Code of American Samoa to nullify an election and call for a new election; that Respondents be compelled to make available a transcript of the hearing before the Election Board.

Respondents failed to file any answer in writing regarding Petitioner's complaint.

At the beginning of the trial, the Acting Attorney General, on behalf of the Respondents, made a motion to the Court to dismiss Petitioner's complaint on the ground that the Court did not have jurisdiction to consider the case. The Court denied the motion on the ground that Petitioner had nowhere else to go to appeal from the decision of the Election Board and the order of the Election Commissioner calling a new election in Tualauta County. The Assistant

Attorney General stated that Petitioner should have the benefit of an appeal to the Courts, but that Petitioner's action should have been in the nature of a Writ of Certiorari rather than a complaint seeking injunction. There being no legally trained counsel in American Samoa who Petitioner could consult in seeking to protect his rights, it would have been hardly equitable or fair to disregard Petitioner's right to a hearing on a technicality.

The testimony and the evidence at the hearing indicated that a general election for members of the House of Representatives throughout American Samoa was called for November 3, 1964, in accordance with the provisions of the Constitution of American Samoa, the Code of American Samoa, 1961 Edition, and the Governor's Memorandum No. 55-1964. Prior to the election date, candidates filed for their names to be included in the ballot, as provided by law, with the Election Commissioner. There were three candidates that filed to run as Representative from Tualauta County. These were the Petitioner, Muagututi'a F. Tuia, Otto Haleck, and Fonati Aufata. The testimony and evidence further revealed that poll lists of the qualified voters in each county were prepared by the office of the Election Commissioner and made available to each of the candidates from Tualauta County before and during the election date. Sample ballots were also made available. On November 3, 1964, the election was held in Tualauta County and throughout Tutuila. There appeared to have been four polling places for the Tualauta election situated at Pavaiai, Faleniu, Tafuna, and Iliili. After the polls closed at the time set by the Election Commissioner, all the ballots were taken to Iliili, the central place designated by the Election Commissioner for the counting and tabulating of the ballots for Tualauta County. The ballots were counted and tabulated under the supervision of Fiaui Mulitauopele, a duly appointed representative of the Election Commissioner, in

the presence of all three candidates. The candidates had the opportunity to accept or to challenge the ballots as they were tabulated. According to the uncontradicted testimony there were a total of 522 votes cast at the election at Tualauta County, of which 12 of them were voided and the other 510 were accepted by all the three candidates. As tabulated and counted the accepted ballots were cast as follows: 287 for Tuia, 204 for Haleck, and 19 for Fonati. Following the completion of the tabulation of the votes on November 3, 1964, the representative of the Election Commissioner announced publicly that the Petitioner was the winner in the election for the House of Representatives seat for Tualauta County.

The Petitioner called five witnesses and introduced five exhibits. The Respondents presented no evidence on their own behalf except as it was testified to through Petitioner's witnesses. The five witnesses called by the Petitioner were the Election Commissioner, Fofo Sunia; the Chairman of the Election Board, Leonard A. Yandall; Lauelo Taomua, election supervisor at Pavaiai; Luapo, election supervisor at Faleniu; and Otto Haleck who brought the original appeal before the Election Board.

Petitioner's Exhibit No. 1 consisted of a photo-copy of the letter of appeal dated November 4, 1964, to the Election Board which Haleck addressed to "Board of Election Appeals." Petitioner's Exhibit No. 2 was a mimeograph copy of the original Public Notice issued by the Election Commissioner, dated December 1, 1964, calling a new election for Tualauta County. Petitioner's Exhibit No. 3 was a photo-copy of a letter dated November 27, 196, [sic] and addressed to the Election Commissioner by the Chairman of the Election Board, requesting the Commissioner ". . . to re-run the election in the Tualauta County at the earliest date." Petitioner's Exhibit No. 4 consisted of a copy of Exhibit No. 1 and four photo-copy pages made up of a Bill of Particulars

and alleged examples of election irregularities set out by Otto Haleck and addressed to the Chairman of the Election Board. Petitioner's Exhibit No. 5 was entitled "Report, Findings of Fact, and Recommendations," and signed by the Election Board and dated December 8, 1964, eleven (11) days after the original letter from the Chairman of the Election Board to the Election Commissioner requesting a "re-run" of the election and dated seven (7) days after the Election Commissioner issued the Public Notice for the new election.

Fofo Sunia, the Election Commissioner, was the first witness. He testified that he had acted as Election Commissioner pursuant to Section 2.0503 of the Code of American Samoa and Governor's Memorandum No. 55-1964; that he had supervised the elections of November 3, 1964, including the election held in Tualauta County; that he had a staff to assist him in conducting the election; that he gave his staff members in all the counties the same general instructions; that there were three candidates for the House of Representatives from Tualauta; that Iliili had been designated as the place where the Tualauta ballots were to be tabulated and counted after closing of the polls; that he did not know if all three candidates were present at the counting since he, Fofo, was not there; that he had authorized and delegated one Fiaui Mulitauopele to count the ballots for Tualauta County; that he knew from Fiaui that Petitioner and Haleck were present at the counting; that his representative, Fiaui, had given him, Fofo, the results of the election as follows: 287 votes for the Petitioner, Tuia, 204 votes for Haleck and 19 votes for Fonoti, and that 12 votes were voided or discounted at the tabulating; that he had not received any complaints from any of the candidates from Tualauta County prior to or during election day; that he had received no complaint personally from any candidate in Tualauta; that he only received a copy of the complaint filed by

565

Haleck after the election with the Election Board; that rosters of all the voters in Tualauta County were available to all three of the candidates; that he, Fofo, was not a member of the Election Board; that he was called to testify before the Election Board, the first time in the Senate Chambers with only members of the Election Board and the second time when Haleck, Lolo, and Tuia were present at an Election Board meeting; that he had testified mostly in Samoan, without being sworn, on both occasions; that he had testified regarding the Bill of Particulars filed by Haleck; that he didn't know if there were other meetings of the Election Board; that he thought he was the only witness before the Board; that to his knowledge 35 aliens in total had voted in Tualauta County, 21 of these having voted in Faleniu; that about fifty aliens were registered as qualified voters in the Voters' Rolls from Tualauta County because at first the Attorney General in the presence of the Acting Attorney General, Mr. Tindal, had advised him, the Election Commissioner, that aliens could be registered to vote unless they expressed allegiance to a foreign state; that later the Attorney General had issued another opinion saying that aliens should not be allowed to vote; that after receiving said opinion, he had stopped registering aliens as voters, but that the aliens who had already registered were not advised individually that they were disqualified to vote after receiving the second opinion from the Attorney General, and that the names of the aliens were not stricken as ineligible to vote on the rolls used in the election; that until he received the second opinion of the Attorney General aliens throughout Tualauta County had been allowed to register; that in the 1962 election—two years after the constitutional provision regarding the qualification of voters—all aliens were allowed to vote for candidates to the House of Representatives throughout American Samoa because the question of aliens voting did not arise; that at

the first meeting with the Attorney General in 1964 it was decided that those aliens who did not make a declaration of allegiance to a foreign state could vote or those who had not sworn allegiance to a foreign state; that he did not know which of the three candidates the aliens who voted at Tualauta County had voted for.

Regarding the alleged violation of the voter not signing his name at the extreme right column of the Voters' Roll at the time of voting, the Election Commissioner testified that he had given instructions to his staff workers to have the voters sign the rolls but that the failure of the voter to sign the rolls did not disqualify the vote; that another district in Sua County had not required the voters to sign the rolls and the votes had been counted as valid.

When asked where he got the authority to call a new election for Tualauta County, the Election Commissioner said he relied on Chapter 2.05 of the Code of American Samoa and on Governor's Memorandum No. 55-1964, and upon the ruling of the Election Board; that he had received the letter from the Election Board November 27, 1964; that he had consulted with Mr. Tindal, Acting Attorney General, before making the announcement for the new election; that after Mr. Tindal explained the law to him, he, the Commissioner, made the decision to call a new election; that he did not know what would have happened if he had refused to call the new election at the request of the Election Board.

When asked how many votes Haleck had objected to, the Commissioner answered he did not know exactly, but that they were quite a few. When asked what would be the result of the tabulation if all objections made by Haleck were upheld, the Commissioner said he could not answer.

In answer to the Acting Attorney General's leading question, Fofo stated he had declared the election of November 3 null and void in his capacity as Election Commissioner, after he received the statement from the Election Board

saying the Board had reason to believe a new election should be called. When asked by Mr. Tindal if the election was conducted in accordance with proper procedure and the law, Code and Constitution, the Election Commissioner said such had been his intention, but that *after* Haleck's complaint was received it was found that certain aspects of the election had not been strictly in accordance with the election procedures. When asked by the Acting Attorney General if Haleck's objections were sufficient to declare the election invalid, the Commissioner answered that it could not be determined if the election was invalid; that as of December 10, 1964, he would not have determined that the election was invalid if he had not received the ruling from the Election Board, but that he thought the Election Board had valid reason.

Again in answer to a question by Mr. Tindal, the Commissioner testified that on November 3, 1964, after the counting of the ballots for Tualauta County, Petitioner, Tuia, had been declared the winner. The Commissioner further testified that the rolls with the names of the qualified voters had been prepared by his office; that pursuant to the first consultation with the Attorney General, aliens were registered as qualified voters for a week or so; that the aliens were not contacted individually to be told they were not qualified to vote after the second opinion by the Attorney General was received.

When asked which procedures by the Commissioner were not followed, Fofo answered that the instruction to the supervisors to have the voters sign the rolls was not followed. When asked if the voters should have presented a registration receipt at the time of voting, the Commissioner answered in the affirmative, but that the Pulenu'us could identify the voter in lieu of a receipt; that he thought about 20 or more had not turned in receipts in Tualauta County and that he did not know for which candidate those electors

had voted. When asked if ballots should be voided when the electors failed to sign the roll or surrender a receipt, the Commissioner said he did not know of any such provision in the law.

In answer to a question by the Acting Attorney General whether any other procedures had not been followed, the Commissioner testified that two or three underage persons had voted; that they were duly registered on the rolls. When asked why aliens were prohibited from voting, the Commissioner said it was done after he checked with the Attorney General's office; that in 1962 there was no restriction whatsoever on aliens voting or registering and that no opinion was then sought from the Attorney General but that times have changed regarding the status of aliens; that aliens were disqualified from voting under Article II, Section 7, of the Constitution of American Samoa; that none of the aliens who voted was asked if he owed allegiance to a foreign state; when asked who the aliens referred to in Article II, Section 7, of the Constitution of American Samoa applied to, the Commissioner stated he did not know; that he did not know if the aliens who voted had passports from a foreign country; that to his understanding Section 2.0510 of the Code of American Samoa authorized the Board to nullify an election and order a new election; that if the Election Board so instructed him he would order a third election for the same seat. When asked who had the final say as to the qualifications of members of the House of Representatives, the Election Board or the members of the House, the Commissioner answered that the House had the final say as to the qualifications of its members.

In answer to questions by the Acting Attorney General, the Election Commissioner testified that the constitutional provision in Section 7 of Article II did not apply to alien voters; that it was possible for an individual to disclaim allegiance by certain acts, but that he did not know if that

was possible in American Samoa or not; that he did not know if a disclaimer of allegiance could be accepted from an alien to qualify him to vote in American Samoa, after talking to the Attorney General.

Regarding the closing of the polls, the Commissioner testified that he had published the time for the opening and closing of the polls so that everyone would get a chance to vote; that the time for the closing of the polls at Pavaiai had been changed to one-half hour earlier and that such change had been announced to the villages according to Samoan Custom by the Pulenu'us yelling the information throughout the village; that the opening of the polls at Iliili had been extended one-half hour from 5:30 p.m. to 6:00 p.m.; that he had given instructions that if people were standing in line at the scheduled time for closing the polls, the polls were to remain open until all those in line had voted; that everyone was to be given an opportunity to vote; that the election had been held in accordance with Section 2.0503 as to procedure; that he did not know of even one alien who had voted for the Petitioner.

The next witness was Leonard Yandall, Chairman of the Election Board, who will henceforth be referred to as Yandall. Yandall testified that the Election Board was composed of himself as Chairman and two other members, High Chief Faiivae, father-in-law of Haleck's brother, and H. T. C. Masaniai. That Haleck's appeal had been filed with the Board on November 4, 1964, and he had later submitted other papers dated November 14, 1964; that the first meeting of the Election Board was not called until November 24, 1964, 20 days after Haleck's appeal was first received; that the pencil notations on Petitioner's Exhibit No. 4 were his own, Yandall's, notes; that he had asked Fofo to contact Haleck and Tuia about the Board hearing because Fofo was responsible for the entire conduct of the election; that at the first hearing of the Election Board on November 24,

only the Election Commissioner and Petitioner, Tuia, had testified; that Haleck had not testified even though he was present and that the Board did not call Haleck to give testimony; that the only testimony given on Haleck's behalf was given by his counsel, Lolo; that there were only two members of the Board present, he and Faiivae, at the meeting; that the testimony had not been taken under oath because he as Chairman stated that the Board had no authority to administer oaths because there was no provision in the Code; that even though the Board could not administer oaths, it had the authority to investigate and render a decision to correct an election matter; that although the Board could have required Haleck to give testimony regarding his appeal, it did not ask for his testimony; that the Board's public meeting had been tape-recorded from 10:00 a.m. to 3:58 p.m.; that the absent Board member who sat at a later executive meeting did not listen to all the testimony given at the open hearing, even though he had an opportunity.

Yandall further testified that Petitioner's Exhibit No. 5 was the Election Board Report; that the findings of November 24, 1964, were not based on evidence gathered at the public hearing or any other hearing; that it was from information gathered by Yandall personally. In connection with the patients at the Leprosarium, Yandall testified that they were not bona fide residents of Tualauta County where the hospital is situated even though the patients registered at Tafuna as voters in 1964 and voted at Tafuna in the 1962 elections, regardless how many years the patients had been at the hospital; that he had an interpretation of a bona fide resident from the Acting Attorney General; that a person who was born in Nu'uuli but later moved permanently to Pavaiai where he ran a business was not a bona fide resident of Pavaiai to entitle him to vote there, but that if Haleck had moved from his county of birth he would be eligible to vote in Tualauta County because he was a farmer, but

that patients at the Leprosarium could not vote in Tualauta County even if they had registered and appeared in the official rolls of Tualauta County.

Regarding voting by aliens in Haleck's Bill of Particulars, stated as "aliens who voted for my opponent," Yandall was asked if Haleck had produced witnesses to that effect at the public hearing and he answered in the negative, and that Tuia had produced one witness at the hearing denying the allegation. Yandall testified that of the *30* alleged to be aliens by Haleck, 14 were found *not* to be aliens; that even though the Board found 14 of the listed persons not to be aliens, Haleck's allegations regarding the voting of the aliens he listed were true; that there were a total of 50 aliens registered in the rolls of Tualauta County; that he did not know who the aliens that voted had voted for; that 35 aliens had voted in Tualauta County, a total of 20 of the 35 having voted in Faleniu, Mapusaga, and Malaemi; that no aliens had voted in the other districts of Tualauta County.

When asked if the Election Board had substantiated Haleck's allegations in his Bill of Particulars of his supporters having been refused to register, Yandall said there was no such proof or evidence.

When asked if the extension of the voting time had prejudiced Haleck as he alleged, Yandall stated that the Board had found no evidence that Haleck had lost votes by the early closing of the polls at Pavaiai or by the later closing of the polls at the other villages.

When asked regarding Haleck's allegation in his Bill of Particulars that 14 voters had crossed the county line to vote in Tualauta, Yandall testified that the Board had found that all of these people were entitled to vote in Tualauta except for two families who were found to be non-residents of Tualauta, one of these being the caretakers of the Leprosarium who have resided in Tualauta County for

years. That the Board could not determine definitely where the other 12 people should vote; that such boundaries should be determined by the Court or by the District Councils; that all but four of the 14 were registered as legal voters of Tualauta County in the Roll of Voters for the 1962 election.

Yandall testified that regarding the three minors alleged by Haleck in his Bill of Particulars as having voted, Haleck had not given any proof, all the information having come from Petitioner, Tuia, but that one of the three had not voted.

Regarding Haleck's charges in his Bill of Particulars that one voter had registered and voted twice, Yandall testified that the person who appeared registered twice had voted only once.

Regarding Paragraph "E" of Haleck's Bill of Particulars to the effect "that my opponent directly interfered with the election procedures by making several attempts to obtain ballots from election officials so that he could distribute them to his supporters," Yandall testified that Tuia had not succeeded; that the charge was substantiated but the extent of Tuia's interference could not be determined. On the copy of the Bill of Particulars, Yandall had written in his own hand, "No evidence. Did not take any voting ballots." Yandall testified the Board had not bothered to question the election officials at the polls regarding Haleck's allegations of Tuia's interfering with the election. Yandall testified that at the open Board meeting Tuia had testified that he had gone to get blank ballots at the request of the election supervisor at Tafuna because they had run out of ballots, and that when the ballots were refused Tuia had returned to the supervisor at Tafuna to tell him that he could not get ballots, and that no attempt was made to get ballots by force or subterfuge. Yandall testified that notwithstanding the above testimony, the Board went by Haleck's testimony,

even though Haleck never testified before the Board; that it had been based on the Election Commissioner's information. Yandall testified that only Tuia had testified on the matter of interference. When told that Tuia had requested the Board to call election officials to testify regarding this charge, Yandall testified he did not recall. When asked who the ballots were supposed to be for, Yandall testified the Board had not inquired.

Yandall further testified that he had sought the advice of the Attorney General's office regarding the Board's testimony being taken under oath. That Mr. Tindal had first advised that the Board could take testimony under oath and then had decided otherwise; that after the Acting Attorney General had said, "Yes," he, Yandall had referred Mr. Tindal to Sections 2.08 and 2.04 of the Code of American Samoa.

Yandall testified that at first he did not think the Election Board had the power to declare the election null and void, but that after seeking Mr. Tindal's advice there was no doubt that the Board had the power to hold the election void. Then he testified the Board had already decided on its power before it saw Mr. Tindal. Yandall testified that the Board presumed the power to hold an election null and void by the authority delegated by the Governor of American Samoa in Memorandum No. 55-1964 and Chapters 2.05 and 2.06 of the Code of American Samoa; that the phrase "appeals from Election Commissioner" gave the Board the authority to void an election. Yandall testified that if the Attorney General had advised the Board it did not have the authority to nullify an election the Board would have followed the Attorney General's advice.

When asked if the Election Board had authority to "request" the Election Commissioner to call a new election, Yandall answered in the affirmative. Yandall said the Board's letter did not direct the Commissioner to call a new

election, but that if the Commissioner had refused to call a new election it was the opinion of the Attorney General that the Election Board had the power to order the Commissioner to order a new election.

When asked if Section 2.0509 of the Code of American Samoa regarding the counting of the ballots and determining the validity of the cast ballots was followed procedural-wise, Yandall testified that the Board had not inquired whether such procedure called for in the Code was followed by the election officials. Yandall testified that he did not know if the three candidates were present at the counting of the Tualauta County ballots. Yandall further testified that even if all the three candidates were present and checked and accepted all the ballots except for the 12 voided, that did not mean that the three candidates had agreed to the results. Yandall testified that altogether, including aliens and the alleged non-residents of Tafuna and others, the Election Board had disallowed 40 votes. Asked if the deducting of all those 40 votes from Tuia's votes would make any difference in the election outcome, Yandall stated that perhaps it would reduce the number of votes received by Tuia. Yandall affirmed that at the public hearing of the Board he had stated that one error in the election was enough to declare the election null and void if it was a serious irregularity.

Yandall testified that the Board had not asked Haleck if he had had access to the Roll of Voters of Tualauta County or if Haleck had checked the same.

Yandall testified that the phrase "from the result of the election in Tualauta County" in Haleck's letter referred to the outcome of the balloting, but not the final result.

Mr. Yandall was then cross-examined by the Acting Attorney General, Mr. Tindal. When asked how he had begun the investigation of Haleck's complaint of November 4, 1964, Yandall stated he first cpmtacted [sic] Fofo, the Election Commissioner, by telephone, telling Fofo to contact

Tuia and Haleck and tell them that the Board would meet some time to look into Haleck's protest; that a letter was sent to Fofo on November 14, 1964; that the Board held its first meeting on November 24, 1964, and started by calling the Election Commissioner to testify. Yandall testified, again, that the notations in pencil in Haleck's complaint and Bill of Particulars were Yandall's personal notes.

Yandall testified that he had gone to the hospital at Tafuna regarding the residence of the patients there who voted in Tualauta County; that the Board had used the Code and Constitution to arrive at the definition of bona fide resident; that he had gone to the Attorney General's office to discuss the definition of bona fide resident on November 27, 1964, after the Board had reached its decision but before the Board's decision was announced; that the Attorney General said a farmer would be a bona fide resident if he had been there for over one year because it showed the farmer intended to make such residence permanent.

The Acting Attorney General repeated most of the questions already asked on direct from Mr. Yandall. We will refer to Mr. Yandall's answers only when they differ from his answers previously.

Mr. Yandall repeated that the total number of votes that could have been disallowed was only 40.

When asked in what instances the election officials were careless, Yandall stated that in allowing aliens to register and vote; that the patients at the Leprosarium were allowed to vote without investigation by the election officials as to their residence; that some people registered twice, though none in Tualauta County were found to have voted twice; that two persons voted twice; that he, Yandall, did not know how many voters in Tualauta County had signed the rolls, but that the majority had not signed, but that he did not know what a majority of the 522 votes cast was; that 327 receipts had been surrendered and 195 receipts

were unaccounted for; that he didn't know the purpose of the signing, maybe it was a precaution.

Yandall testified that the Board's finding that the registration by sons of Pulenu'u was irregular, was a wrong finding, that it should have been that voters had been registered by minor sons of the Pulenu'u; that there were no qualifications in the law set up for registrar of voters, that he did not think it was an unlawful act; that he did not know if the registrars were duly appointed by the Commissioner; that the Board had made no detailed investigation of the allegations that Tuia had interfered with the election, except for information from the Commissioner who had not been present and other people, not more than three; that the Board had ruled that there was no proof of Tuia's success in getting ballots; that the Board had never concluded that Tuia had interfered with the election; that Fofo had stated he was not present at the voting place at the Board hearing; that the supervisors of the election at the alleged polling place were not called to testify; that he, Yandall, had gotten information from Haleck and Schirmer outside of the Board's public hearing, even though Schirmer had not been present at either of the two polling places; that only three people were invited to appear at the Election Board meeting —Fofo, Tuia, and Haleck; that the Board's decision to nullify the election had been unanimous; that the failure of the candidates to object at the counting of the ballots did not estop them from filing an appeal with the Election Board, that he knew of no such requirement.

On re-direct Yandall testified that two of the voters found not to be bona fide residents of Tafuna were a couple who have lived there for years and are caretakers of the hospital for the Government of American Samoa; that the Board had failed to question Haleck regarding Tuia's testimony at the Board meeting even though Haleck was present; that the Board believed it had the authority to change the results

of an election; that Faiivae, a member of the Election Board, was related to Haleck, Faiivae's daughter having married Haleck's brother; that he did not know if Masaniai, the third member of the Board, was related to Haleck; that he did not know why Masaniai had refused to listen to the whole recording of the open meeting of the Board before going along with the Board in its decision; that he did not know if the voters had failed to sign the rolls in only one of the districts in Tualauta County, mainly Faleniu, that he did not remember; that the Board had not prepared and did not have available a transcript of the open hearing of the Board as asked for in the Petitioner's complaint filed in Court.

When asked why the Board had waited 20 days after receiving Haleck's letter to call its first meeting, Yandall answered that because he was one of the busiest souls in American Samoa. Yandall testified that up to the present the Election Board had certified no winner in any of the seats for the House of Representatives; that the Board had not looked into the Sua County election where it was alleged that the voters did not sign the rolls; that the function of the Election Board in certifying candidates was largely ministerial, that of "O.K.'ing" the names sent to the Board by the Commissioner.

In answer to Judge Tauala's question, Yandall testified that if the alleged 40 unqualified votes were deducted from Tuia's total, Tuia would still have a majority of the votes in Tualauta County, but that there were discrepancies.

Yandall testified he did not know where the patients at the Leprosarium were originally from; that he did not know whom the patients had voted for. In answer to Judge Misa's question, Yandall testified that he believed Otto Haleck was a bona fide resident of Faleniu even though he did not know if Haleck had land in Faleniu.

578

Yandall testified that the carelessness or negligence of the election officials alone was sufficient for the Board to order a new election called; that technically a candidate could get a negligent person to act as supervisor at the polls and that if said candidate lost the election he could use the supervisor's negligence as a basis to get the Election Board to order a new election.

Tuia next called Lauolo Taumua as a witness. Lauolo testified that he had conducted the election at Pavaiai; that Tuia had tried to get blank ballots on election day for the purpose of taking the ballots to the Tafuna polling place where they were needed; that he had refused to give Tuia any ballots and Tuia had left without insisting or trying to grab any of the ballots; that Tuia did not want the ballots for his supporters; that Otto Haleck and the Pulenu'u, Galoia, were present when Tuia came and went; that he did not know if Tafuna was out of ballots and that he had not checked that fact.

Tuia next called Luapo as a witness. Luapo testified that he was appointed supervisor to conduct the election at Faleniu; that Tuia had come asking for ballots to be used at Tafuna where they were out of ballots; that he had refused to give Tuia any ballots; that Tuia had mentioned to him the name of the Tafuna supervisor who had sent him for the ballots; that later Tuia came back with some voters to vote in Faleniu, supposedly the ones that did not get to vote in Tafuna for lack of ballots; that the polls at Faleniu had closed after the time originally set for closing to allow people to vote. In answer to the Acting Attorney General's question, Luapo testified that he did not know for a fact if Tafuna had run out of ballots; that no election official from Tafuna had come to get ballots; that Tuia had not tried to take the ballots by force or theft, and that neither Schirmer nor Haleck was present at Faleniu when Tuia came.

Tuia next called Otto Haleck as a witness. Haleck testified that he was one of the three candidates for the House of Representatives from Tualauta County on November 3, 1964; that he was present when all the votes were counted at the Iliili school; that 522 ballots had been cast in the election altogether; that he had personally examined each of the ballots for the purpose of accepting or rejecting them; that all the candidates examined the ballots and had agreed upon the acceptability of the votes; that following the tabulation and counting of all the votes for Tualauta County, the Election Commissioner's representative had announced the results of the election and had announced Tuia as the winner of the election based on the votes counted and accepted by all three candidates.

When asked if he had checked the voter's roster for Tualauta County before or during the election as to their qualification for voting, Haleck answered that he had checked the Roll of Voters at his home after the votes were counted; that at the time of the counting he had no idea there were any aliens in the voter's roster.

In answer to a question from Mr. Tindal if he had first-hand knowledge of Tuia's trying to get ballots at Faleniu and Pavaiai, Haleck answered that he had been at Pavaiai but had not been in Faleniu; that he did not know if Tuia was acting as messenger for the supervisor at Tafuna; that Schirmer was not at Pavaiai when Tuia came.

Tuia argued that the Election Commissioner had testified that the election had been held at Tualauta on November 3, 1964, and that the election had been conducted in the same method as in all other counties; that Fofo had appointed supervisors for the election and had designated a central place for the counting of the votes after closing of the polls; that Haleck testified he had been present at the counting of the ballots, that of the 522 ballots cast all three candidates had accepted 510 as valid and had rejected 12 as

invalid; that in accordance with Section 2.0509 of the Code a public announcement had been made by the representative of the Election Commissioner after the ballots were counted, that Tuia was the winning candidate by a majority of all the votes in Tualauta County; that the Election Commissioner testified that the Voters' Rolls were available to all three candidates before and during the election; that Haleck had testified he had accepted 510 ballots; that Haleck could have and should have checked the Voters' Roster before and during the election; that Fofo had testified that out of 50 aliens duly registered as voters, 35 had voted in Tualauta County; that Haleck had accepted the 35 votes cast by aliens at the counting; that Haleck challenged only 20 alien votes in his appeal to the Election Board, having contested the alien votes only in Faleniu, Mapusaga, and Malaeimi; that the Election Commissioner had received no complaint from Haleck either before or during the election; that by his actions Haleck had lost any right to any appeal he might have had.

Tuia further argued that Haleck had only appealed the result of the election that showed Fonoti with 19 votes, Haleck with 204 and Tuia with 287 votes; that Haleck was not able to prove that disallowing the votes he challenged in his Bill of Particulars would change the results of the election; that the votes as announced on the night of the election still stood; that Haleck had not proven who the alleged unqualified voters had voted for; that the election results were provided by the voters of Tualauta County and not by the Election Commissioner, the Election Board, or the candidates; that all three candidates had run under the same basis and all materials were made available to all three of the candidates; that Haleck would certainly not have objected if the results had been in his favor; that the final count of the election takes place after the counting of all the votes; that the final tabulation and results of the

election had been published in the DAILY BULLETIN by the OSI and that the Election Board should have been aware of the results; that Section 2.0510 states, "Upon completion of the elections . . . the Election Commissioner shall submit a list of the results of each election to the Election Board.", that Yandall had testified that the Election Board had not yet certified even one candidate for the Legislature of American Samoa; that Section 2.0502 set a deadline for the end of the election three weeks after November 3, 1964; that the time for the certification of candidates for all seats in the House expired on November 24, 1964, and that not one election winner had been certified as late as December 11, 1964; that it was questionable whether the Election Board had any right to certify winners after the deadline set out in the Code.

Tuia further argued that the Election Board had acted improperly; that it took the Board 20 days after Haleck's appeal to call the only open hearing it held and that the Board had taken only three days to make its decision, saying that further investigation was not necessary; that only three witnesses had appeared before the Board and only one had testified from firsthand knowledge, Tuia; that the Board had accepted hearsay testimony in reaching its decision while disregarding the testimony of Fofo, Lolo, and Tuia; that out of a list of 14 submitted by Haleck as non-residents, the Board found only three who were non-residents and of these two live permanently in Tafuna at the Leprosarium; that the definition of bona fide resident used by the Board was wrong and arbitrary by saying that only a farmer can become a bona fide resident of a place other than where he was born; that the patients at the Leprosarium had been allowed to vote there in 1962 and were still bona fide residents of the hospital or Tafuna; that the Board was arbitrarily trying to disenfranchise the six sick people who had been in the hospital for years.

Tuia further argued that the Election Board had failed to substantiate Haleck's charge of a "large number of aliens *who voted for my opponent*" (emphasis added); that in fact no one knew how the aliens had voted; that Haleck contested as aliens 14 voters who were American Samoans; that there was no proof that even one alien voted for Tuia; that the Election Board never called even one witness to testify regarding the matter of aliens or non-residents; that the Board failed to call any witnesses regarding the charge of three minors having voted, the only testimony having been the voluntary statement of Petitioner, Tuia; that the allegation regarding the registration receipts had no merit because the testimony showed that the Election Commissioner had instructed the supervisors that in lieu of the registration receipts the voters could be identified by the Pulenu'u as being the right person; that the Election Commissioner had the right to qualify or amend the instruction regarding registration receipts which he had also issued under Section 2.0503 of the Code; that regarding the allegation that Mrs. Westbrook was in Hawaii and appeared as having voted, that in fact Mrs. Westbrook was in American Samoa on November 3, 1964, but left for Hawaii on November 4 and that he, Tuia, had a note from Pan American to prove it; that the Election Board refused to call Mr. Westbrook or anyone else to testify regarding her whereabouts on November 3, 1964; that he, Tuia, had testified at the Board's open meeting that Mrs. Westbrook had been in American Samoa on November 3, 1964; that although he, Tuia, had requested that all testimony be taken under oath, the Board had refused; that even though he had requested a written transcript of the Board's hearing, the Board had not made it available.

Tuia argued that the Election Board did not call one single witness directly connected with ascertaining the validity of Haleck's allegations, except for Tuia himself;

that the Board's substantiation of Haleck's allegation of Tuia's interfering with the election had not been proper; that neither of the supervisors at the polling places had been called to testify and that Yandall had testified that the Board had found no evidence or interference by Tuia; that Haleck's accusation that Tuia was trying to get ballots to distribute them to his supporters had certainly not been proven; that if the Board had called two or three witnesses the damaging accusations of Haleck and the Board against Tuia would have been avoided; that based on such flimsy and inconclusive testimony and evidence, the Election Board found sufficient cause to declare the election null and void.

Tuia argued that he did not obtain a copy of the Board's findings until December 9, 1964, the day before the hearing in Court, and only upon his request to the Board; that the Election Commissioner announced the new election on December 1, 1964; that the running of a new campaign would be a great personal and financial strain if a new election is allowed; that the Election Board and the Election Commissioner had failed to prove that they each or together have the authority under the law to nullify a properly held election and to order a new election; that Respondent's basis for their authority has not been shown; that although Mr. Tindal compared the Election Board to a Court of Appeals, the witness Yandall contradicted him by saying the Board did not even have the power to take testimony under oath; that the Board's manner of investigation left much to be desired, especially in its accusation of Tuia's interference without exhaustive search for the facts and contrary to the testimony produced by the only witness before the Board, Tuia himself; that the election was held in accordance with the procedures set up by the Election Commissioner; that the appeal by Haleck should not be recognized since the election was decided by the voters and not the Election Board, Election Commissioner or candidates; that even if the

truthfulness of the allegations by Haleck were granted, the results of the election would not change; that the results of the election as announced on November 3, 1964, must stand. That the Court should grant Petitioner's request for an injunction against the calling of a new election.

Mr. Tindal, on behalf of Respondents, argued that he had had no opportunity to prepare even though he had access to the exhibits before the Petitioner; that the issue before the Court was contained in two questions, to wit:

1. Whether the Election Board was empowered by the statute to declare the election null and void and to call a new election, and

2. Whether the Election Board was empowered to exercise said authority.

At this point Mr. Tindal referred to the motion to dismiss which he had made at the opening of the trial and which the Court denied.

He further argued that while it was true that the statute did not specifically give the Board authority, the statute should be liberally construed; that the Board was qualified to hear Haleck's appeal; that Section 2.0509 is only for the purpose of counting the ballots and does not estop a candidate from contesting an election; that the Board's action in nullifying the election was justified from the hearing; that the Board was established to hear appeals and certify candidates; that the winner declared by the Election Commissioner is a reflection of the will of the voters, but that the Board has the power to look into the election so that all the ballots accepted are qualified voters and results in a clear and unquestionable choice of a candidate; that if there is a doubt in the Board's mind, it should not and cannot certify a winner.

Mr. Tindal argued that all the argument of the Board not calling witnesses was irrelevant; that the Board could arrive at its decision in five (5) minutes; that the Board

585

gathered enough evidence as to procedure, though evidence under oath would have been better; that there was no evidence that anyone was lying, even though some of the points did not require a result that the election was invalid; that among the questionable votes were 35 aliens, six patients at the Leprosarium, three Tafuna non-residents, Mrs. Westbrook and one Kalone; that even if all the votes were deducted, Tuia would still have a plurality or majority, but that the decision was not based on that alone; that Tuia's alleged obstruction of the election was of no concern or had any bearing on the Board's decision; that the Board found that Tuia's action had no effect on the outcome of the election.

Mr. Tindal argued that other points justified the Board's action in nullifying the results of the election and calling a new election; that the closing of the polling places earlier or later contrary to the published time might have had an effect on the result of the election; that Haleck did not want to bother to vote at a polling place that was open; that the majority of the voters did not sign the roll at the time of voting; that the signature was necessary to make sure the voters would not lie; that only 327 registration receipts were collected at the polls; that on the basis of the evidence the Board rendered its decision that the winner in the election was doubtful; that the Board refused to certify Tuia as the winner; that the Acting Attorney General disagreed with the Court's opinion that the case before the Court had nothing to do with certification; that the Election Board cannot say that the election resulted in a clear and unquestionable winner in the election; that the Board found that certain allegations in Haleck's complaint were valid; that even if the investigation by the Board was done in a negligent, careless, reckless, and incompetent manner, the action of the Board is still justified; that if the investigation was prudent in part the Board had power to nullify the re-

sults of the election of November 3, 1964, and to order the Election Commissioner to call a new election.

Tuia argued in rebuttal that the Board could not have come to a fair decision on the evidence it got; that the quality of the evidence obtained by the Board was insufficient; that the Board's substantiation of Haleck's charge that he, Tuia, had interfered with the election was reckless and had ruined Petitioner's reputation; that any new election would necessarily be affected by the allegations of Haleck and findings by the Board in writing; that said allegations intimate he is a thief.

Regarding the early closing of the polls at Pavaiai, Tuia argued that the earlier time had been announced two days earlier by order of the Election Commissioner who is charged by law with setting the hours for the polls to be open and closed.

In connection with the allegation of people voting without surrendering their registration receipts, Tuia argued that the Election Commissioner had testified that he had instructed the election supervisors to allow people to vote without the receipt if the voter was identified by the Pulenu'u as a bona fide resident; that the law did not require the surrendering of the receipt and that the Election Commissioner had the authority under the law to set up procedures for voting.

In connection with the voter failing to sign the roll, Tuia argued that the Election Commissioner had testified that the signatures on the roll had not been taken only in Faleniu, one of the districts in Tualauta County; that the Commissioner had testified that the failure to sign the rolls would not invalidate the vote; that there was nothing in the law positively requiring the voter to sign the roll.

Tuia concluded by arguing that the Acting Attorney General certainly had more time to prepare than the Petitioner since he had knowledge of the Board's information and find-

ings way before he, Tuia, did; that the Election Board had been irresponsible, negligent and reckless in its investigation and Finadings [sic] of Fact which they published on December 8, 1964; that the Election Board's report should not be considered.

Following the hearing of the case, the Court issued the following order on December 11, 1964:

December 11, 1964

"Now after considering the testimony, the evidence, the exhibits and the argument of counsel for plaintiff and defendant, and after consulting with the Samoan judges, it is hereby ORDERED, ADJUDGED AND DECREED by this Court that Plaintiff Muagututia F. Tuia be and he is hereby granted a temporary restraining order and that Defendants, the Election Board, consisting of Mr. L. A. Yandall, Chairman, High Chief Faiivae and High Chief Masaniai, as Member, and the Election Commiwwioner [sic], Mr. Fofo Sunia, in their official and individual capacities, be and they are each hereby restrained from calling an election for the House of Representatives' seat at Tualauta County, American Samoa, on December the 12th, 1964 or at any time before December 25, 1964, pending the Court's final decision on this matter; and provided that counsel for Plaintiff and Defendants will be allowed to submit written briefs to the Court in this matter up to not later than 9:00 o'clock in the morning, Tuesday, December the 15th, 1964.

"This Court will have rendered its final decision on this matter by Friday, December 18th at 4:00 P.M. If neither party appeals, the Court's decision will dispense with the matter of the temporary restraining order. If there is an appeal, there will be proper time for one before December 25, 1964, the expiration date of this temporary restraining order."

The Court received additional briefs from Tuia by 8:20 a.m., December 15, 1964. The Respondents' brief was not received until after the deadline, at 9:20 a.m. on December 15, 1964.

As we see it, the main issue before the Court is whether either the Election Commissioner and/or the Election Board have the authority and power under the Constitution

of American Samoa, the Code of American Samoa or Governor's Memorandum 55-1964, to nullify the results of a duly called and held and concluded election, and whether the Election Commissioner on his own or at the request of the Election Board has the authority to call a new election for the same seat in the House of Representatives of American Samoa.

■ It is the finding of the Court, after considering the testimony, the evidence and the Exhibits, that the investigation into Haleck's charges by the Election Board were held in a careless, negligent, irresponsible and reckless manner, without the slightest attempt to get at the truth of the charges or to call witnesses who could have had access to pertinent information in the matter before the Board, and in a manner repugnant to the ethics of fair play, resulting in improper and inconclusive findings and in great personal damage to the Petitioner.

Respondents ascertained that the power of the Election Board in nullifying and voiding an election and ordering the Election Commissioner to call a new election are derived specifically from Sections 2.0504 and 2.0510 of the Code of American Samoa and from the Governor's Memorandum No. 55-1964. Respondents further claim that the authority of the Election Commissioner to call a new election is derived from Section 2.0503 of the Code and from Governor's Memorandum 55-1964. Governor's Memorandum No. 55-1964 was never introduced into evidence by the Respondents.

■ Section 2.0503 of the Code of American Samoa reads as follows:

"ELECTION COMMISSIONER: The Governor shall appoint an Election Commissioner on or before July 1 of each election year to supervise and administer each election. The Election Commissioner shall have the power to establish the time of election in each election district including the hours during which the polls shall be

opened, and to establish such procedures and make such rulings, not inconsistent with law, as are necessary for the orderly conduct of the election."

 Section 2.0504 of the Code of American Samoa reads as follows:

"ELECTION BOARD: The Governor shall, on or before July of each election year, appoint an Election Board of three Members, two of whom must be permanent residents of American Samoa. *The Election Board shall act as a board of appeals regarding any matters referred to it by the Election Commissioner or by any person aggrieved by a decision of the Election Commissioner.* Appeals shall be taken by oral notice to any member of the Board." (Emphasis added.)

 Section 2.0510 of the Code of American Samoa reads as follows:

"CERTIFICATION OF ELECTION RESULTS: Upon completion of the elections in all of the election districts, the Election Commissioner shall submit a list of the results of each election to the Election Board. When the Board is satisfied that the elections have been conducted *in accordance with this chapter and the established procedures of the Election Commissioner,* it shall certify the election of the winning candidates in each election district to the Governor, the Chief Clerk of the House, and the Secretary of the Senate." (Emphasis added.)

 Section 2.0503 authorized the Election Commissioner to supervise and administer the election and to establish election procedures and to make such rulings not inconsistent with the law. Under these powers the Commissioner has the power, as he did, to issue the hour for the opening and closing of the polls at Tualauta County, to authorize electors to vote without surrendering their registration receipts if identified by the Pulenu'u as legal voters in the district, and to make a ruling not invalidating any vote in the case where a voter failed to sign the rolls at the time of voting. All this and other matters of procedure the Commissioner can do under the law. But nowhere is the Com-

missioner given the power or authority to call a new election either on his own motion or at the request of the Election Board which would have the effect of voiding and nullifying the results of an election held in accordance with the law and the Constitution of American Samoa which sets out a specific date for the holding of general elections.

 Section 2.0504 of the Code states in part, *"The Election Board shall act as a board of appeals regarding any matters referred to it by the Election Commissioner or by any person aggrieved by a decision of the Election Commissioner."* (Emphasis added.) It is obvious that the matter before this Court is neither a matter referred by the Election Commissioner to the Election Board nor an appeal by a person aggrieved by a decision of the Election Commissioner. The appeal here, if any, is one from the results of a mandate of the electorate, but it is not even this. The Election Board is seeking to overturn and nullify the results of a legally held election. We believe that this section was intended to take effect before an election as in a case where the Election Commissioner would refuse to certify a person as a candidate or refused to give or sell to a candidate a copy of the rolls of voters or any other pre-election grievance. But even if this section, by the stretch of the imagination, were to be held applicable after election time, there is certainly nothing in this section of the Code that gives the Election Board the power or authority to make a properly held election null and void and to order or request the Election Commissioner to call a new election.

 Section 2.0510 deals with the certification of election results. What results is the Board to certify? Obviously the results of the votes as announced by the Election Commissioner or his representative after the polls closed at which he announced a winner if any one received the majority of all the votes cast and counted. "When the Board is satisfied that the elections have been conducted in accord-

ance with this chapter and the established procedures of the Election Commissioner, it shall certify the election of the winning candidates in each election district to the Governor. . . ." Under this section the Election Board is not set up to decide the winner of the election; it merely is there to certify the winning candidates as submitted to it by the Election Commissioner. As Mr. Yandall, Chairman of the Election Board, testified, this matter of certification is merely a ministerial function of the Board. But even if the task were not merely ministerial, we are not faced here with the problem of certification. Mr. Yandall testified that up to the date of the hearing the Election Commissioner had not forwarded to the Board the election returns on any of the elections for the House of Representatives, and that the Board had not yet certified one single winner of the 1964 elections from which the Ninth Legislature of American Samoa is to be organized. Again in the case before the Court, the Election Board is trying to set aside a duly held election and to call a new election for the same office. There is nothing in this section which directly or indirectly empowers the Election Board to do that which it seeks to do.

This Court is of the unanimous opinion that the above cited and discussed sections of the Code do not directly or by implication of law empower the Election Board to hold the election held on November 3, 1964, Null and Void and/or to request or order the Election Commissioner to call a new election for the House of Representatives seat for Tualauta County.

This Court is further of the unanimous opinion that the Election Commissioner has no power or authority under the law to call a new election as requested of him by the Election Board, or as announced in the "Public Notice" of December 1, 1964.

In a democratic system of government the marrow of its success is that such government owes its existence and de-

rives its powers to govern from the consent of the people. In such a system the right of the individual to vote is sovereign, inviolate and, yes, even sacred. The vote is the only direct control which the individual has over his government and indirectly over his own well-being. This God-given but hard-won right of a free man is not to be lightly or hastily tampered with. After the voter has spoken his mind and contributed his efforts to the results of a free election, such a decision should not be disturbed unless he, the voter, through his duly elected representatives has set out a specific provision under the law.

██ This Court is not deciding who was the winner of the election in Tualauta County on November 3, 1964. We believe that the electorate have already spoken. We further believe that the election is a political matter and that once the election is held, the only Body that has the authority to look into the qualifications of the elected candidates is the Legislature of American Samoa. Article II, Section 22, of the Constitution of American Samoa reads as follows:

"Qualifications and Officers: Each House of the Legislature shall be the judge of the qualifications of its members and shall choose its own officers."

It is hereby ORDERED, ADJUDGED AND DECREED by this Court that Petitioner, Muagututi'a F. Tuia be and he is hereby granted a permanent injunction and that the Respondents, the Election Board, consisting of Mr. L. A. Yandall, Chairman, High Chief Faiivai and High Talking Chief Masaniai, as members, and the Election Commissioner, Mr. Fofo Sunia, in their official and individual capacities, be and they are each hereby permanently restrained from calling an election for the House of Representatives seat for Tualauta County, American Samoa, for the Ninth Legislature of American Samoa.

Done this 18th day of December 1964.